IN THE SUPREME COURT OF TEXAS
 
════════════
No. 
08-0989
════════════
 
Italian Cowboy Partners, 
Ltd.,
Francesco Secchi and Jane Secchi, 
Petitioners,
 
v.
 
The Prudential Insurance 
Company of America and
Four Partners, LLC d/b/a Prizm Partners and
d/b/a United Commercial 
Property Services, Respondents
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the 
Eleventh District of Texas
════════════════════════════════════════════════════
 
 
Argued April 14, 2010
 
 
            
Justice Hecht, joined by Justice Willett and Justice Guzman, 
dissenting.
 
 
            
Francesco and Jane Secchi owned and operated 
two successful Dallas-area restaurants. Italian Cowboy was to be the third. To 
find just the right location, they secured a broker, conducted demographic 
studies, examined restaurant reports by the Texas Alcoholic Beverage Commission, 
and viewed many potential sites. They learned that a restaurant was closing in 
the Keystone Park Shopping Center, an area they liked. They had eaten at other 
restaurants in the shopping center, and they found out those restaurants were 
operating profitably. They met with the landlord’s agent, and for five months, 
assisted by their attorney, they negotiated a lease. In the meantime, they 
inspected the property repeatedly, sometimes with the agent present and 
sometimes by themselves. The lease went through seven drafts. The Secchis had been in the restaurant business twenty-five 
years. This was not their first rodeo.
            
On October 18, 2000, Francesco Secchi signed a 
lease on behalf of the tenant, Italian Cowboy Partners, Ltd. Not quite nine 
months later, on July 12, 2001, the Secchis sued the 
landlord, Prudential Insurance Co., and its agent, Prizm Partners.
 

 
 
 
 The lease 
 stated:
  
 Tenant 
 acknowledges that neither Landlord nor Landlord’s 
 agents, employees or contractors have made any representations or 
 promises with respect to the Site, the Shopping Center or this lease 
 except as expressly set forth herein.
 
 The petition 
 stated:
  
 Italian 
 Cowboy Partners and the Secchis reasonably and 
 detrimentally relied on the representations of Prudential and Prizm that the Premises were suitable for use as a 
 restaurant and were a prime restaurant site.
 
 
 
  
 
 
 
 
Each statement is a statement of 
fact, like “the sun is shining” or “the sky is blue”. In the lease, 
Italian Cowboy stated that Prudential and Prizm did 
not make representations other than those contained in the lease. In the 
petition, Italian Cowboy stated that Prudential and Prizm did make representations, representations that 
were not contained in the lease. Both statements cannot be true. Either 
representations not contained in the lease were made, or they were not 
made.
            
The Secchis knew full well whether the 
statement in the lease was true when they made it. They were Italian Cowboy’s 
only representatives. They do not claim to have been mistaken — that 
representations made by Prudential and Prizm were 
supposed to have been included in the lease but were inadvertently omitted by 
mistake. They do not claim to have been tricked — that important provisions were 
surreptitiously removed from the lease before Francesco signed it. The Secchis do not contend that after studying seven drafts of 
the lease with their lawyer, they just forgot to include representations that 
Prudential and Prizm had made about the suitability of 
the site for use as a restaurant. They do not plead that they were only rubes 
duped into stating something that was not true. The lease stated the facts as 
the Secchis knew them to be: representations not 
included in the lease were not made.
            
And that is exactly what Frances Fox Powell, the person who dealt with 
the Secchis for Prudential and Prizm, testified to at trial. The Secchis testified, contrary to the lease, that Powell had 
told them the building was “problem-free”, that previous tenants had “no 
problems” with the building, and that it was a “perfect building”. Asked at 
trial whether she had told the Secchis “that the 
building was in perfect condition”, she answered, “No.” Had she made “any 
misrepresentations concerning the condition of the building?” “No.” Had “a sewer 
gas odor ever [been] pointed out . . . or 
mentioned . . . as being present” by the general manager of the 
restaurant that had vacated the premises before Italian Cowboy leased them? 
“No.” Powell testified that the Secchis’ first mention 
of an unpleasant odor was in February 2001. She testified:
Q         
At any time prior to the closing of the restaurant permanently and the 
filing of this lawsuit, did either Mr. or Mrs. Secchi 
ever come to you and say, “Mrs. Powell, you failed to tell us something about 
this restaurant that was significant”, or “there was something about this 
restaurant that you told us that proved to be contrary”. Did that ever take 
place?
 
A         
No.
 
Q         
In December, January, February, March, April, May, June up through July, 
did Mr. and Mrs. Secchi and you have any conversation 
where it was suggested to you that you had made a statement to them that had 
proven to be untrue?
 
A         
No.
 
Q         
Or that you failed to disclose something to them?
 
A         
No.
 
Had she concealed anything she knew 
about the premises from the Secchis? “No.” Had she 
deceived them in any of her dealings with them? “No.” Had she “always [been] 
truthful with them”? “Yes.”
            
Of course, as the Court notes, Powell’s testimony was rejected by the 
trial court, as reflected in its findings of fact and judgment. But the issue is 
not whether Powell was truthful or whether there is evidence to support the 
judgment. Powell’s testimony cannot be ignored because it establishes that the 
parties now dispute a fact — what representations were made — about which 
they unquestionably agreed at the time they inked the lease. The issue is 
whether the law allows a sophisticated party in a commercial transaction, 
represented by counsel, with full knowledge of all the circumstances, without 
mistake or duress of any kind, to include in a contract a statement of fact that 
is important to the other party, and later disavow it as having been false at 
the time it was made. Italian Cowboy and the Secchis 
can prevail on their fraud claim only if they successfully defrauded Prudential 
and Prizm. Can a party claim fraud based on his own fraud?
            
The Court ignores this issue and presents instead the question “whether 
the lease agreement disclaims reliance on representations made by Prudential, 
negating an element of Italian Cowboy’s fraud claim.”[1] Since the lease says absolutely nothing 
about reliance, this is a pretty easy question to answer, and the Court’s poor 
strawman does not put up much of a struggle before 
being demolished. As the Court observes, the law has long been skeptical of a 
party’s agreement, sometimes referred to generally as a merger clause, not to 
rely on statements made by the other party outside the contract. Experience 
teaches that people are often not as serious as they should be in agreeing to 
such provisions. That, the Court concludes, is the situation we have here. 
Italian Cowboy intended nothing by its statement in the lease other than a 
merger clause; merger clauses often use similar language; merger clauses do not 
effectively disclaim reliance; and therefore, Italian Cowboy’s statement does 
not disclaim reliance.
            
At the risk of appearing a stickler, I think what matters is the 
statement Italian Cowboy made, not what it may have intended would result. Even 
if intent were important in this situation, one cannot say the word “none” and 
intend by it to mean the word “some”. In the Court’s view, by stating that 
Prudential and Prizm had not “made any 
representations”, Italian Cowboy either meant the exact opposite — that 
Prudential and Prizm had made some 
representations — or it meant nothing at all.
            
The principal authority on which the Court relies is our 1957 decision in 
Dallas Farm Machinery Co. v. Reaves,[2] so its facts are worth recounting. Reaves 
traded in his two Ford tractors and loaders for a new Oliver tractor and loader 
on the strength of a salesman’s representations that the new equipment would do 
a better job faster.[3] After trying out the new machinery for 45 
minutes, Reaves concluded it was worthless and the representations were false.[4] He demanded the return of his old 
equipment. Dallas Farm Machinery refused and sued for the balance due on the 
contract.[5] The contract was a one-page form with a 
provision on the back warranting that the goods sold were “well made and of good 
material”, agreeing to replace defective parts for six months, and stating: 
“This warranty is made in lieu of all other warranties, express or implied, and 
no warranty is made or authorized to be made other than herein set forth.”[6] The Court held that this provision did 
not preclude Reaves’s counterclaim for rescission based on fraudulent 
inducement.[7] The Court did not suggest that Reaves was 
familiar with the capabilities of the equipment he bought — on the contrary, it 
was his lack of familiarity with the Oliver equipment that led to his complaints 
— or that the contract was negotiated, or that he was represented by 
counsel.
            
Reaves recognizes the reality that parties do not always pay 
attention to contractual provisions or recognize their consequences. But in 
three cases since — Prudential Insurance Co. of America v. Jefferson 
Associates, Ltd.,[8] Schlumberger Technology Corp. v. 
Swanson,[9] and Forest Oil Corp. v. 
McAllen[10] — we have refused to apply Reaves 
absolutely when sophisticated parties represented by legal counsel negotiate 
commercial agreements. The Court acknowledges that the Reaves rule has 
exceptions, but only if parties choose clear and unequivocal language and 
disclaim reliance on representations rather than the existence of 
representations. The contracts in Schlumberger and Forest Oil both 
stated that “no promise or agreement which is not herein expressed has been 
made”,[1][1] provisions substantively 
indistinguishable to Italian Cowboy’s acknowledgment that neither Prudential nor 
its agents had “made any representations or promises . . . except as 
expressly set forth” in the lease. But the parties in Schlumberger and 
Forest Oil added that they were not “relying upon any statement or 
representation” of any other party but were instead “relying on [their] own 
judgment”.[12] According to the Court, the contracts in 
Schlumberger and Forest Oil precluded fraud claims only because 
they used the word “relying”, which Italian Cowboy’s lease did not 
do.
            
The requirement that parties use clear and unequivocal language helps 
ensure that they will understand the import of their contractual statements, so 
it is surprising that the examples the Court offers are provisions in which the 
language is internally inconsistent. The parties in Schlumberger and 
Forest Oil agreed that no representations had been made and that they 
were not relying on ones that had been made. For lawyers accustomed to pleading 
in the alternative, this may make perfect sense, but someone less flexible might 
have more trouble understanding how representations were both made and not made. 
A flat-out averment like Italian Cowboy’s, that no representations were made, 
period, is surely clearer and less equivocal than a statement that 
representations were not made, or if they were, they were not relied 
on.
            
The Court’s preference for a disclaimer of reliance over a disclaimer of 
representations is simply a mystery. According to the Court, a party who states 
(somewhat equivocally) that although representations may have been made, he is 
not relying on any of them, should be held to his word 
and his later claim of fraud foreclosed. But a party who unequivocally denies 
that any representations were made to induce his agreement, other than those in 
the agreement itself, may later sue for fraud on 
representations he denied were ever made. For purposes of forestalling 
litigation, his denial is essentially void. If the Court has any reason for 
distinguishing between the two disclaimers, it is nowhere explained.
            
It may not matter. In a footnote, the Court warns that even “a clear and 
unequivocal disclaimer of reliance” may not be “binding on the parties 
involved”, depending on “the circumstances”.[13] When would such a disclaimer not be 
binding? According to the Court, whenever the parties have not discussed during 
their negotiations the substance of the later-alleged misrepresentation — in 
this case, the unpleasant odor on the premises.[14] But Italian Cowboy, Prudential, and Prizm 
all claim they knew nothing about the odor before the lease was signed. Since 
Italian Cowboy had had every opportunity to inspect the premises and discuss 
their suitability with prior restaurant tenants, the purpose of the disclaimer 
was to avoid disputes over such matters after the contract was signed. The trial 
court did not believe Prudential and Prizm, but if it 
had, the discussion the Court would require to uphold the disclaimer would have 
been impossible, and the disclaimer would not have precluded the lawsuit. In the 
Court’s view, a clear and equivocal disclaimer of reliance is effective only if 
no dispute arises after the contract was signed that was not discussed 
beforehand. Otherwise, the Court gives parties but one choice: 
litigate. 

            
I would hold Italian Cowboy to the statement it made in the lease when it 
was completely capable of being accurate, ably counseled, and fully 
incentivized: “neither Landlord nor Landlord’s agents, employees or contractors 
have made any representations or promises with respect to the Site”.[15] Italian Cowboy’s recourse should lie 
solely in its claim for breach of an implied warranty of suitability. But that 
claim, too, is precluded by Italian Cowboy’s agreement. In the lease, it agreed 
to “be responsible for all repairs to the interior and non-structural components 
of the Premises, including but not limited to the interior 
. . . , and all . . . ventilating 
. . . systems . . . .” I disagree with the Court that 
work necessary to remedy the odor in the premises fell outside this 
responsibility. In fact, the odor was later remedied, by the restaurant-tenant 
who succeeded Italian Cowboy, by repairs to the interior, including the 
ventilating systems.
            
The Court’s depreciation of the written word in this case is troubling 
and exacts a high price, not only to the parties here, but to all who are denied 
the right to negotiate freedom from uncertain, unending litigation. This case 
was filed in July 2001, over nine years ago. Were Italian Cowboy bound by its 
statements in the lease, its fraud claim could have been quickly dismissed, 
leaving only the warranty claim and the simpler issue of how the lease allocated 
responsibility for repairing a problem like the odor. The case has already been 
to this Court once before, with Italian Cowboy arguing unsuccessfully that its 
agreement to waive a jury was not binding — other words it used and didn’t 
mean.[16] The trial 
court’s judgment, rendered in 2005, awarded Italian Cowboy $650,700.40 in 
damages and $705,000 attorney fees. With interest, the judgment is well now over 
$2 million. The case is remanded for its third hearing in the court of appeals. 
A new trial is still a possibility. The cost and delay are no one’s fault; they 
are simply the price the system exacts for the denial of freedom of contract. 
The law should allow willing and able parties to avoid a litigation toll-tax and 
agree to greater certainty in their dealings. Because today’s opinion refuses 
that opportunity, I respectfully dissent.
 
                                                                        
                                                                                    

                                                
                        
Nathan L. Hecht
                                                                        
Justice
Opinion 
delivered: April 15, 2011









 
 
 
 

[1] 
Ante at 
___.

[2] 
307 
S.W.2d 233 (Tex. 1957).

[3] 
Dallas 
Farm Mach. Co. v. Reaves, 300 
S.W.2d 180, 181 (Tex. Civ. App.–Fort Worth 1957), aff’d, 307 S.W.2d 233 (Tex. 
1957).

[4] 
300 
S.W.2d at 181.

[5] 
Id.

[6] 
307 
S.W.2d at 234.

[7] 
Id. at 
239-241.

[8] 
896 
S.W.2d 156, 161-162 (Tex. 1995).

[9] 
959 
S.W.2d 171, 180 (Tex. 1997).

[10] 
268 
S.W.3d 51, 58 (Tex. 2008).

[11] 
Forest 
Oil, 268 
S.W.3d at 54 n.4; Schlumberger, 959 S.W.2d at 
180.

[12] 
Forest 
Oil, 268 
S.W.3d at 54 n.4; Schlumberger, 959 S.W.2d at 
180.

[13] 
Ante at ___ 
n.8.

[14] 
This is 
one of several instances cited by the Court in which a disclaimer would not be 
binding.
[15] 
Apparently 
confused about the issues in the case, the Court mischaracterizes the dissent 
and Prudential as arguing that a merger clause excuses parties from “hav[ing] to disclose known 
defects”. Ante at ___. This case does not involve an issue of 
nondisclosure. Italian Cowboy claims that Prudential made affirmative 
misrepresentations that were fraudulent, not that it failed to disclose 
information. “Failing to disclose information is equivalent to a false 
representation only when particular circumstances impose a duty on a party to 
speak, and the party deliberately remains silent.” In re Int’l Profit 
Assocs., Inc. 274 S.W.3d 672, 678 (Tex. 2009) (citing Bradford v. 
Vento, 48 S.W.3d 749, 755 (Tex. 2001), and SmithKline Beecham Corp. v. 
Doe, 903 S.W.2d 347, 353 (Tex. 1995)). Italian Cowboy does not assert that 
Prudential was under such a duty in negotiating the lease.
[16] 
In re 
Prudential Ins. Co. of Am., 148 
S.W.3d 124, 140-141 (Tex. 2004).